# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLEN M. FALLIN, | : | CIV. NO. 1:22-CV-00265 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| COVENANT TRANSPORTATION | : | |
| GROUP, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

## I. Introduction.

Plaintiff Glen Fallin ("Fallin"), proceeding pro se, brings the instant complaint against his past employers. Fallin brings claims for a willful violation of his rights under the Fair Labor Standards Act, unjust enrichment, fraudulent misrepresentation, tortious interference with economic advantage, contractual breaches, and the negligent hiring, retention, training, and supervision of employees. Currently pending are the defendants' motion to dismiss or, in the alternative, to transfer venue, and Fallin's motion to compel discovery. For the reasons set forth below, we will exercise our jurisdiction, conferred through the parties' consent pursuant to 28 U.S.C. 28 U.S.C. § 636(c), and will grant the motion to transfer venue and deny the motion to compel discovery.

## II.  Background and Procedural History.

Fallin began this action by filing a complaint on February 22, 2022. *Doc. 1*.

He also filed an application to proceed *in forma pauperis* (*docs. 3, 6*), which we

granted (*doc. 7*).  The complaint identifies five defendants: (1) Covenant

Transportation Group, Inc.[1] ("the Group"); (2) Covenant Transport, Inc.

("Covenant"); (3) Star Transportation, Inc.[2] ("Star"); (4) Landair Transport, Inc.

("Landair"); and (5) Joey B. Hogan[3] ("Hogan"). *Doc. 1* at 1–2.  All of the parties

consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c)

The following facts are taken from the complaint.

### A.  Factual History.

In early April 2019, Fallin saw an internet advertisement for employment with

Covenant. *Doc. 1* at 10.  This advertisement "promis[ed] wages of at least $1,300 per

week to deliver loads out of the Dollar General distribution center in Bethel, PA." *Id.*

---

[1] The defendants filed a signed declaration that asserts that Covenant Transportation Group is now named Covenant Logistics Group, Inc.  *Doc. 11-2* at 2.  According to the complaint, the Group is the "corporate parent" of Covenant and Star, and Landair is "a subsidiary" of the Group. *Doc. 1* at 8–9.

[2] The defendants also assert in the signed declaration that the correct corporation name is Star Transportation, LLC. *Doc. 11-2* at 2.

[3] Fallin states that he brings claims against Hogan "in his individual capacity [a]nd corporate capacity as President, [the Group.]" *Doc. 1* at 2.

Accordingly, Fallin contacted Covenant and "engaged in numerous telephone conversation[s]" with a Covenant recruiter ("the recruiter"). *Id.* According to the complaint, "[s]hortly before April 15, 2019," the recruiter made some sort of employment offer to Fallin, which Fallin accepted "and [he] agreed to travel to orientation in Chattanooga, TN." *Id.* After traveling to Chattanooga via Greyhound Bus, Fallin began "an orientation program" and took a driver training course for "difficult backing" along with three other candidates. *Id.* Though all four of the candidates, including Fallin, failed the training, Fallin "protested vigorously" until all four of the candidates were offered employment. *Id.* Fallin accepted this employment offer on April 22, 2019, and "was assigned a tractor within about two days." *Id.*

Approximately one week later, Covenant assigned Fallin "to deliver a load to Pennsylvania, which [Fallin] accomplished successfully." *Id.* at 10–11. Covenant then directed Fallin to travel to the terminal in Allentown, Pennsylvania to await an initial trip with a mentor. *Id.* at 11. Fallin did so, waiting for "several days" at the Allentown terminal and living in his tractor without compensation, until this initial trip took place. *Id.* On May 6, 2019, Fallin accompanied a mentor to make deliveries to three Dollar General stores "in the central and eastern Pennsylvania areas[.]" *Id.* Fallin worked for 14 hours without a break to complete these deliveries. *Id.* At one point in the day, after the mentor's father brought him lunch, the mentor stated, "I wouldn't want my father doing this." *Id.* Fallin "realized" that if such hours and

3

conditions were typical of a workday with Covenant, he would not be able to reach the advertised $1,300 payment per week. *Id.*

Accordingly, Fallin sent an email to Covenant's coordinator for the Dollar General account—who was located in Chattanooga, Tennessee—and "not[ed] that the exceeding demanding work consisted of far more unloading than driving[,] question[ed] whether the promise of $1,300 per week could be realized consistently [, and] inquired about other possible assignments." *Id.*  The next day, the Allentown terminal manager "notified" Fallin that he "was being removed from the Dollar General account" and he would instead be "moving empty trailers from New Jersey to Baltimore, MD." *Id.* at 11–12.  Fallin was then assigned to "retrieve a tractor that was being repaired in New Haven, CT, which entailed at least four days of staying in a motel while a needed mirror was secured by the truck dealer where the tractor in question was being repaired." *Id.* at 12.

At some unspecified point after this new assignment, Fallin "learned that . . . Star was hiring drivers and applied for employment there." *Id.*  On June 2, 2019, Fallin reported to Star's operating center in LaVergne, Tennessee to begin orientation, after which, Fallin "was offered and accepted employment as a [Star] company driver." *Id.*   During his time employed by Star, Fallin lived in his tractor, "drove more than 100,000 miles[,]" and was compensated "only on the basis of dispatched miles as listed in a publication," rather than actual mileage. *Id.*  This

4

payment structure "was not disclosed prior to [Fallin's] acceptance of employment[.]" *Id.*

On February 19, 2020, Fallin was traveling from Dallas, Texas, to Altavista, Virginia, on assignment from Star, when he received notice that he was to travel instead to the Star terminal in LaVergne, Tennessee to meet with Star Safety Manager, Jeff Bills ("Safety Manager Bills"). *Id.* at 12–13. When Fallin arrived at the terminal and his fleet manager directed him to surrender the bill of lading for his current delivery, Fallin announced that, "in light of the obvious gravity of his being relieved of an assigned load, [he] felt it best that [he] tender his resignation, and [Fallin] immediately prepared a writing stating unconditionally that [he] was resigning." *Id.* at 13. In the complaint Fallin explains that his "sole motivation in preparing the letter of resignation was his realization that [he] was being relieved of his assigned load[,]" although he believed that "there was no legitimate reason for the termination of his . . . at-will employment or the imposition of any lesser discipline." *Id.*

Fallin then proceeded to Safety Manager Bills's office and "announced that [he] was tendering his resignation, 'if there was any possibility that an outcome of this meeting could be the termination of his employment,' or words precisely to that effect." *Id.* at 12–13. Safety Manager "Bills responded that 'unfortunately' [Fallin's] employment was being terminated, but that [he] would be permitted to resign." *Id.* at

14.  Safety Manager Bills explained that the termination decision was driven by Landair's new "no-fault point system," which required the termination of employees, like Fallin, who had been in five "accidents," whether the employee was responsible for the accident or not. *Id.* at 14.  Safety Manager Bills gave Fallin a document listing the five "accidents" in which Fallin was involved. *Id.*  In the complaint, Fallin explains how each of these accidents are inconsistent with the Star Driver Manual's definition of accident. *Id.* at 14–16.  This document "nevertheless indicated that [Fallin] had been guilty of 'safety' infractions – a[ ] knowingly false and devastatingly defamatory allegation that renders a driver unemployable and which did result in [Fallin] being deemed ineligible for rehire by any of the companies within the organization managed and overseen by [the Group]." *Id.* at 16.  Fallin asserts that if he had known about the adoption of the no-fault point system, he "would have resigned and accepted either of two offers that had been tendered by other trucking companies or possibly would have secured a better offer." *Id.*  According to Fallin, he only chose to maintain his employment with Star "out of loyalty to his fleet manager." *Id.*

## B.  Claims and Relief.

Fallin states in his "introductory statement" that the complaint "seeks redress of" a number of listed "wrongs." *Id.* at 2–3.  We construe this list of "wrongs" as

asserting ten claims against the defendants.  Fallin brings seven claims against the

"corporate defendants," which Fallin defines as including Star, the Group, and

Covenant: (1) willful violation of Fallin's right to compensation "in accordance with

the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. 201, *et*

*seq.*, and the regulations promulgated to effectuate those provisions"; (2) unjust

enrichment; (3) "breach of contract[ ] by unilateral modification of contract terms";

(4) breach of contract "by breaching and abrogating material terms . . . of the *Star*

*Driver Manual*"; (5) "[f]raudulent misrepresentation . . . by purposely inducing

[reliance on] the *Star Drive Manual*"; (6) "[t]ortious interference . . . with [Fallin's]

economic advantage, specifically [his] employability"; and (7) "[n]egligent hiring,

retention, training, and supervision of the individual employees, agents, or other

representatives of the Corporate Defendants who made or participated in making" the

decision to terminate Fallin's employment or "made or participated in the making of

one or more decisions that precipitated, justified, or enabled" Fallin's termination. [4]

---

[4] While describing his claim for willful violation of the Fair Labor Standards
Act, Fallin states that the Group, Covenant, and Star were "acting together as a
joint employer or, in the alternative, as an 'integrated enterprise' and referred to
hereinafter [in the complaint] as 'the corporate Defendants[.]'" *Id.* at 3.  Fallin then
uses the term "corporate Defendants" to identify the parties against whom he
brings claims for unjust enrichment, "breach of contract[ ] by unilateral
modification[,]" fraudulent misrepresentation by inducing reliance on the Star
Driver Manual, tortious interference with economic advantage, and negligence in
hiring, retention, training, and supervision of certain employees. *Id.* at 4–7.  He
instead uses the term "Defendant corporations" when alleging breach of contract
"by breaching and abrogating material terms . . . of the *Star Driver Manual*[.]" *Id.*

*Id.* at 3–7.  Fallin further asserts a claim against Covenant and the Group for breach of the contractual terms of an employment offer. *Id.* at 3.  Additionally, Fallin brings two claims against Hogan—one for fraudulent misrepresentation and a second for negligent misrepresentation—based on Hogan's statements in the Group's orientation video that the corporation abides by the "golden rule"[5] and, therefore, was committed to treating employees fairly, although "in actual practice there was no such commitment." *Id.* at 5–6.

For relief, Fallin seeks damages which he categorizes as both "compensatory" and "commendatory." *Id.* at 17.  Fallin calculates that he experienced damages of $120,000 "for wages lost proximately because of the impact of the knowingly false allegation that [he] violated 'safety' standards." *Id.*  Further, Fallin seeks "payment of minimum wage[ ] for all time spent in [his] assigned tractor." *Id.*  And Fallin seeks "compensatory damages" of "10 percent of the wages [he was] paid . . . based on dispatched mileage actually driven." *Id.*

---

at 4.  To the extent that Fallin intends to bring this claim against a different set of defendants with this slight alteration, that is entirely unclear.  We, therefore, construe the complaint as bringing the claim for breach of contract 'by breaching and abrogating material terms . . . of the *Star Driver Manual*[,]" against the Group, Covenant, and Star. *Id.*

[5] Fallin defines the "golden rule" as "the principle of treating others as they wished to be treated." *Id.* at 5.  Fallin states that he "understood the aforesaid statement" that CTG "adhered to the 'golden rule[,]'" "to mean that CTG—and . . . Covenant and Star [were] committed to a principle of fairness to its employees." *Id.* at 6.

### C. Procedural History.

After the defendants waived service, they jointly filed a motion to dismiss or, in the alternative, to transfer venue ("the motion to dismiss or transfer") (*doc. 11*) and a brief in support of that motion (*doc. 12*). Fallin then filed three motions for extensions of time to file his brief in opposition of the motion to dismiss or transfer, all of which we granted. *Docs. 21, 22, 23, 24, 25, 26*. Instead of filing a brief in opposition, however, Fallin filed a motion to compel discovery ("motion to compel"). *Doc. 27*. Fallin moved for an extension of time to file his brief in support of the motion to compel. *Doc. 31*. Before we decided this motion, Fallin filed his brief in support of the motion to compel. *Doc. 32*. We then suspended all deadlines pending the scheduled telephone conference (*doc. 33*) and considered the brief in support properly filed.

On September 23, 2022, we held a telephone status conference. *Doc. 37*. After this conference, we ordered Fallin to file his brief in opposition to the motion to dismiss or transfer on or before October 3, 2022. *Doc. 38*. Fallin complied and filed his brief in opposition to the motion to dismiss or transfer on October 4, 2022;[6] he categorized this brief, however, as "preliminary," because, in his opinion, he required discovery to fully oppose the motion to dismiss or transfer. *Doc. 41*. In the

---

[6] Though this brief was filed after the deadline set, we see no prejudice to the defendants from this slight delay.

meantime, the defendants filed, and we granted, a motion for an extension of time to respond to the motion to compel. *Docs. 39, 40*. We informed the parties that we would set a deadline for such response once we rendered a decision on the defendants' motion to dismiss or transfer. *Doc. 40*. On October 12, 2022, Fallin filed a motion for reconsideration of this decision (*doc. 42*) and on October 26, 2022, the defendants filed a brief in opposition to this motion (*doc. 45*).

On October 14, 2022, the defendants filed a reply brief regarding the motion to dismiss or transfer. *Doc. 43*. Fallin then filed a motion to exclude "[the] venue argument raised for [the] first time in [the] defendants' reply brief in support of" the motion to dismiss or transfer ("motion to exclude") (*doc. 46*) and a brief in support of the motion to exclude (*doc. 49, 50*). The defendants filed a brief in opposition of the motion to exclude. *Doc. 51*. We denied the motion to exclude and granted Fallin leave to file a sur-reply on or before December 27, 2022, to "address any arguments which he believe[d] he did not have a chance to address fully in his brief in opposition." *Doc. 53*. Fallin then filed a motion for "vacatur or clarification" of that order. *Doc. 54*. We denied this motion and gave Fallin an extended deadline to file a sur-reply, until on or before January 3, 2023. *Doc. 55*. This deadline has passed, and Fallin did not file a sur-reply. *See docket generally*.

During this motion practice, on November 29, 2022, we ordered Fallin to file a letter on the docket on or before December 27, 2022, "detailing the discovery Fallin

seeks" with specificity. *Doc. 52* ("The fundamental issue at the core of each of these motions is Fallin's asserted need for discovery related to proper venue."). On December 28, 2022,[7] Fallin filed a letter identifying the "elements of discovery . . . that [he] believe[s] are necessary for a full and fair opportunity to present evidence and further argument in support of [his] opposition to Defendants' [motion to dismiss or transfer.]" *Doc. 56*. We then set a deadline for the defendants to file a brief in opposition of the motion to compel.[8] *Doc. 57*. The defendants filed such a brief in opposition (*doc. 58*) and, after requesting and being granted an extension of time to do so (*docs. 59, 60*), Fallin filed a reply brief (*doc. 61*) and a supplement correcting errors in that brief (*doc. 62*).

## III.  Discussion.

### A.  Parties' Arguments.

The defendants' jointly filed motion to dismiss or transfer cites to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. §§ 1404 and 1406. *Doc. 11*. Attached to this motion is a

---

[7] Again, this brief was filed after the deadline set, but we see no prejudice to the defendants from this slight delay.

[8] Accordingly, we find that the motion for reconsideration (*doc. 42*) is moot. An appropriate order follows dismissing the motion for reconsideration as moot.

declaration[9] signed by a Lori Fulmer ("Fulmer"). *Doc. 11-2.* This declaration ("Fulmer declaration") includes the identification of each defendant's place of incorporation, principal place of business, or county residency. *Id.* at 1–3. And Fulmer also asserts that Covenant employees who have personal knowledge of the matter, all documents related to Fallin's employment, and potential witnesses who would testify about Covenant's "policies and practices" are all located in Chattanooga, Tennessee. *Id.* at 3. Fulmer also states that "[a]s part of [Fallin's] hiring and orientation process, he executed, on April 19, 2019, a Conditional Offer of Employment ("Offer") which contains a forum-selection clause." *Id.* The defendants attach this Conditional Offer of Employment document to the declaration. *Id.* at 5–6.

In the defendants' brief in support of the motion to dismiss or transfer, the defendants argue that the forum-selection clause dictates that venue in any federal court other than the United States District Court for the Eastern District of Tennessee ("Eastern District of Tennessee") would be "wrong" and, therefore, dismissal pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a) is proper. *Doc. 12* at 5. The defendants alternatively argue that the doctrine of *forum non conveniens* should

---

[9] We consider this motion for purposes of the Rule 12(b)(3) motion to dismiss for improper venue. *See NextGear Capital, Inc. v. Guierrez*, Civil Action No. 3:18-1617, 2019 WL 1896564, at *3 (M.D. Pa. Apr. 29, 2019) (internal quotations omitted) ("When deciding a Rule 12(b)(3) motion to dismiss for improper venue . . . both parties may submit affidavits in support of their positions.") (citing *MacKay v. Donovan*, 747 F.Supp.2d 496, 501–02 (E.D. Pa. 2010)).

be applied to this case to transfer it to the Eastern District of Tennessee pursuant to 28 U.S.C. § 1404(a). *Id.* at 5–6.

While still asserting his perceived need for discovery relating to the forum-selection clause the defendants submitted, Fallin filed a brief in opposition of the motion to dismiss or transfer. *Doc. 41*.  Fallin argues that the Offer containing the forum-selection clause submitted by the defendants is not the hiring document he signed and, further, he questions whether Fulmer is qualified to make her declaration because she was not employed by Covenant at the time he allegedly signed the hiring document. *Id.* at 2, 3.  Fallin further argues that the forum-selection clause is wholly unenforceable due to procedural unconscionability and because Fallin was relying on a pre-existing verbal employment contract when he signed any employment documents. *Id.* at 10–11, 20–21.  Fallin further argues that the forum-selection clause, if it were enforced, would apply to only those claims against Covenant. *Id.* at 20.

Fallin also argues that the court cannot dismiss this action due to "offensive collateral estoppel" based on a case brought by a different plaintiff in which the U.S. District Court for the Northern District of Florida was presented with an "identical" forum-selection clause and, rather than dismissing the case, transferred it to the Eastern District of Tennessee. *Id.* at 12–14.  Further, according to Fallin, the defendants do not allege that the venue is improper in the Middle District of Pennsylvania as required for a Fed. R. Civ. P. 12(b)(3) dismissal. *Id.* at 14–17.

Finally, without citing legal authority, Fallin asserts that his being granted leave to proceed *in forma pauperis* "generates an unrebutted presumption that a forum 650 miles from [Fallin's] home would deprive [him of his] 'day in court.'" *Id.* at 19.

Contrary to Fallin's assertions, in their reply brief, the defendants clearly argue that venue is improper in the Middle District of Pennsylvania because not only do none of the defendants reside in Pennsylvania but "the events and/or omissions giving rise to Plaintiff's claims occurred within the Eastern District of Tennessee, not within the Middle District of Pennsylvania." *Doc. 43* at 4–5. The defendants argue alternatively that transfer is required due to the forum-selection clause. *Id.* at 6–9. Though given leave to do so, Fallin did not file a sur-reply to address these arguments.

### B.  Venue in the Middle District of Pennsylvania is Improper.

"Federal Rule of Civil Procedure 12(b)(3) allows a party to assert the defense of improper venue." *Allen v. Foxway Transportation, Inc.*, No. 4:21-CV-00156, 2022 WL 265945, at *1 (M.D. Pa. Jan. 27, 2022). "The moving party has the burden of proving improper venue." *Post Acute Medical, LLC v. LeBlanc*, 826 Fed. Appx. 163, 166 (3d Cir. 2020) (citing *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982)). "When deciding a Rule 12(b)(3) motion to dismiss for improper venue, a court must accept as true the allegations in the complaint, although both parties may

submit affidavits in support of their positions." *NextGear Capital, Inc. v. Guierrez*,

Civil Action No. 3:18-1617, 2019 WL 1896564, at *3 (M.D. Pa. Apr. 29, 2019)

(internal quotations omitted) (citing *MacKay v. Donovan*, 747 F.Supp.2d 496, 501–02

(E.D. Pa. 2010)).

     28 U.S.C. § 1391(b), which defines the proper venue for this action,

provides that a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants
> are residents of the State in which the district is located;

> (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of
> property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought
> as provided in this section, any judicial district in which any defendant
> is subject to the court's personal jurisdiction with respect to such
> action.

We thus determine first whether judicial districts exist that satisfy the descriptions

in § 1391(b)(1) and (2), and then, if no such judicial district exists, we will turn to

§ 1391(b)(3).

     We turn first to § 1391(b) to determine whether the Middle District of

Pennsylvania is a proper venue for this action.  Section 1391(b)(1) provides "if all

defendants are residents of the State in which the district is located" then venue is

proper in "a judicial district in which any defendant resides[.]"  28 U.S.C. § 1391(c)

defines residency for venue purposes as a natural person's domicile.  And though

Fallin challenges the validity of the Fulmer declaration (*doc. 11-2*) as it relates to

Fulmer's "personal knowledge" of Fallin's alleged signing of the document containing the forum-selection clause, Fallin does not question the defendants' citizenship. *Doc. 41* at 3. We, therefore, rely upon the Fulmer declaration's assertion that Hogan resides in Hamilton County, Tennessee, and is, therefore, a resident of Tennessee. *See doc. 11-2* at 3. Accordingly, it cannot be said that *all* defendants are citizens of Pennsylvania and, therefore, venue is not proper in the Middle District of Pennsylvania under § 1391(b)(1).

We turn now to consider whether "a substantial part of the events or omissions giving rise to" this case occurred in the Middle District of Pennsylvania. *See* 28 U.S.C. § 1391(b)(2). The Third Circuit "held in *Cottman Transmission Systems, Inc. v. Martino*, [t]he test for determining venue is not the defendant's contacts with a particular district, but rather the location of those events or omissions giving rise to the claim, and although the venue statute does not require a court to select the best forum," the determination whether events or omissions are substantial "may at times seem to take on that flavor." *Post Acute Medical, LLC v. LeBlanc*, 826 Fed. Appx. 163, 165–66 (3d Cir. 2020) (citing *Cottman Transmission Systems, Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)) (alterations and internal quotation marks omitted). "And in order to 'assess[ ] whether events or omissions giving rise to the claims are substantial,' we 'look at the nature of the dispute.'" *Id.* (citing *Cottman Transmission Systems, Inc.*, 36 F.3d at 295).

16

In this case, the complaint contains no allegations of events that took place in the Middle District of Pennsylvania.  The complaint does reference certain deliveries Fallin made early on in his employment with Covenant as occurring in Pennsylvania generally and, construing the complaint in the light most favorable to the plaintiff, we acknowledge that those deliveries may have occurred in the Middle District of Pennsylvania.  *See doc. 1* at 10–11 (alleging that Fallin successfully delivered a load "to Pennsylvania"); *id.* at 11 (alleging that Fallin made deliveries on May 6, 2019, to three Dollar General stores "in the central and eastern Pennsylvania areas").  Fallin's claims, however, are based on corporate decisions regarding orientation, payment policies, and termination policies. *See generally id.*  A total of up to four deliveries at the beginning of Fallin's employment with Covenant, prior to his eight-month employment with Star in which he travelled 100,000 miles, does not amount to a substantial part of the events that gave rise to Fallin's claims. We, therefore, conclude that venue is not proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(2).

Because we conclude below that venue does, in fact, lie elsewhere pursuant to 28 U.S.C. § 1391(b)(1), we do not analyze whether the Middle District of Pennsylvania is a proper venue under 28 U.S.C. § 1391(b)(3) which provides for venue only when "there is no district in which an action may otherwise be brought as provided in this section[.]" 28 U.S.C. § 1391(b)(3).

**C.  In the interest of justice,  we will transfer the case to the Eastern District of Tennessee.**

"When it appears that a case is being pursued in the wrong venue, there are two potential remedies available to the court." *Brizuela v. Johnson*, Civil Action No. 1:22-CV-1304, 2022 WL 6250584, at *1 (M.D. Pa. Oct. 7, 2022).  Applying 28 U.S.C. § 1406, the district court "shall dismiss" a case brought in the wrong venue. Alternatively, "if it be in the interest of justice," the district court may transfer a case brought in the wrong venue to any venue "in which it could have been brought." 28 U.S.C. § 1406.  The defendants' motion to dismiss or transfer seeks transfer to the Eastern District of Tennessee, at Chattanooga. *Doc. 11*.  We thus analyze whether the Eastern District of Tennessee is a venue in which the instant case "could have been brought." 28 U.S.C. § 1406.

We turn again to § 1391(b) to determine whether the Eastern District of Tennessee is a proper venue for this action.  Pursuant to 28 U.S.C. § 1391(b)(1), "if all defendants are residents of the State in which the district is located" then venue is proper in "a judicial district in which any defendant resides[.]"  As discussed above, Hogan is a resident of Hamilton County, Tennessee. *See doc. 11-2* at 3.  Section 1391(c) defines an entity's residency as "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c).  "The paradigm[,] all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of

18

business." *Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)).   The Group, Covenant, Star, and Landair, are thus all residents of Tennessee by virtue of the location of their principal place of business, their place of incorporation, or both. *See docs. 1, 11-2* at 2–3 (outlining that (1) the Group was incorporated in Nevada and has its principal place of business in Tennessee; (2) Covenant is incorporated in and maintains its principal place of business in Tennessee; (3) Star is a citizen of Tennessee, pursuant to the citizenship of its sole member, Landair; and (4) Landair is incorporated in Tennessee, where it also has its principal place of business).

Because Hogan, the Group, Covenant, Star, and Landair are all residents of the same state, Tennessee, § 1391(b)(1) dictates that venue is proper in "a judicial district in which any defendant resides[.]" 28 U.S.C. § 1391(b)(1).  Hogan resides in Hamilton County, Tennessee, which is in the Eastern District of Tennessee. *See* 28 U.S.C. § 123.  Accordingly, the Eastern District of Tennessee is a venue in which this case could have been brought.

Fallin argues that, due to his *in forma pauperis* status, it would not be in the interest of justice to transfer his case to "a forum 650 miles from [his] Pennsylvania home[.]" *Doc. 41* at 19.  The statute does not provide, however, an option for cases brought in an improper venue to remain in that venue. 28 U.S.C. § 1406(a).  Instead, we are faced with the decision to either dismiss the case or, in the interest of justice,

to transfer it to a proper venue. *Id.*  We find that it is in the interest of justice to transfer the case, rather than dismiss it, "in order to protect the plaintiff's rights as a *pro se* litigant" and to "avoid[ ] any prejudice to the plaintiff which might flow from a dismissal of this action on venue grounds." *Jeri v. Finley*, Civ No. 1:19-CV-1805, 2019 WL 5721885, at *3 (M.D. Pa. Nov. 5, 2019) (citing *Burnett v. New York Cent. R. Co.*, 380 U.S. 424, 430 (1965)).

### D.  The Forum-Selection Clause.

Forum-selection clauses, such as the one in this case, are generally enforced. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).  The "appropriate enforcement mechanisms" for forum-selection clauses are "§ 1404(a) and the *forum non conveniens* doctrine[,]" not Fed. R. Civ. P. 12(b)(3) and § 1406(a). *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. Of Texas*, 571 U.S. 49, 61 (2013) (citing 28 U.S.C. §§ 1404, 1406).  Forum-selection clauses will not be enforced, however, when the plaintiff "show[s] that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.*

In this case, Fallin asserts that enforcing the forum-selection clause would be unjust and that the clause itself is invalid. *See generally doc. 41*.  We do not reach the question of the enforceability of the forum-selection clause, however.  We find that

venue is improper in the Middle District of Pennsylvania and accordingly, pursuant to

28 U.S.C. § 1406 and in the interest of justice, we will grant the defendants' motion

to transfer the case to the Eastern District of Tennessee, where the case might have

been brought originally. We will leave the question of enforceability of the forum-

selection clause to the Eastern District of Tennessee, where proper venue lies.

## IV.  Conclusion.

Based on the foregoing, we will grant the defendants' motion to transfer the

case to the United States District Court for the Eastern District of Tennessee.  We will

also dismiss the motion to compel discovery because it sought discovery to determine

the enforceability of the forum-selection clause, a question we do not address.  An

appropriate order follows.


<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge